Filed 11/7/25  In re E.H. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.H., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.J. et al.,<br><br>        Defendants and Appellants. | A173260<br><br>(San Francisco County Super. Ct. No. JD23-3196) |

J.J. (Father) and N.H. (Mother), parents of minor E.H., each appeal from an order of the juvenile court terminating their parental rights, claiming the court erred in concluding the parents failed to establish the beneficial relationship exception, and in determining the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California law did not apply.  Mother additionally contends the court erred in denying her petition to modify the order terminating her reunification services.  The San Francisco Human Services Agency (Agency) concedes, and we agree, that a conditional reversal and remand is appropriate on the ICWA claim, but we find no merit in the parents' remaining claims.  Accordingly, we will

1

conditionally reverse the order terminating parental rights and remand for the limited purpose of compliance with ICWA and its related statutory provisions.

FACTUAL AND PROCEDURAL BACKGROUND

**A. Prior Dependency Proceedings**

This family was the subject of two prior dependency proceedings. In or around August 2018, then two-year-old E.H. was hospitalized for ingesting methamphetamines and opioids. He was detained on allegations of Mother's substance abuse, mental health, and domestic violence issues, and Father's substance abuse, domestic violence issues, and inability to provide care to the child due to a lack of housing and income. The case was closed in February 2020, with legal and physical custody of E.H. awarded to Mother, and no visitation for Father.

A second dependency case was initiated three months later in May 2020 upon allegations that Mother was again using methamphetamines while caring for the child. Mother admitted to relapsing and agreed to have a relative care for E.H. Father was provided with therapeutic visitation from October 2020 to April 2021, but the visits were terminated in May 2021 due to the issuance of a restraining order protecting Mother and E.H. from Father. The second dependency case was dismissed in or around March 2022, with sole legal and physical custody again awarded to Mother, and no visitation for Father.

**B. Charging Petition and Detention**

On June 26, 2023, the Agency filed a juvenile wardship petition under Welfare and Institutions Code[1] section 300, subdivisions (b)(1) and (j), seeking to again detain E.H. (age six) due to Mother's substance abuse and

---

[1] Further unspecified statutory references are to this code.

2

mental health issues and unsafe home environment; the parents' domestic violence history; and Father's substance abuse and failure to protect E.H. from abuse and neglect.

In a combined detention and jurisdiction report, the Agency detailed Mother's long history of substance abuse and inability to appropriately care for E.H. (who is autistic) and his half-brother D.B. (not a party to this appeal). Mother, who was 32 years old at the time of the report, had struggled with substance abuse since she was 15 years old. Her home was unlivable and " 'covered in trash' " with no space to walk. The walls of the bathroom were smeared with feces, and broken glass was found on a bed. The Agency reported that Mother had not been taking her medication for her mental health issues, and that she and D.B.'s father had been using drugs. Mother refused to divulge information about her mental health, submit to a drug test, or sign a release of information allowing the social worker to speak to E.H.'s health care providers. Although Mother later agreed to submit to a drug test, she was aggressive and uncooperative, and no test was completed.

Father was angry that E.H. had been removed from Mother three times, as "he had been telling the Courts from the beginning that she was not able to care for him." Father reportedly wanted custody of E.H. but was unable to take him at the time due to unsuitable housing.

At the initial detention hearing in June 2023, Father's parental status was elevated from alleged to biological father. At the continued hearing the following month, the juvenile court detained E.H. and placed him in foster care. The parents were granted supervised visitation.

**C. Jurisdiction and Disposition**

In its August 2023 disposition report, the Agency recommended that the petition be sustained, that E.H. remain in foster care, and that

reunification services be provided to the parents. The report included the following information.

Mother denied having substance abuse issues but had not complied with random drug screening. She reported having been diagnosed with schizophrenia, depression, and anxiety, and she was seeing a therapist and a psychiatrist who managed her medication. She denied her home was in an unsafe or hazardous condition. She also denied domestic violence with D.B.'s father, but acknowledged prior domestic violence incidents with Father.

According to Father, Mother had substance abuse and mental health issues in the past, but he had "not interacted with her for some years." He acknowledged domestic violence with Mother but claimed she was the aggressor. Father said he had been clean of methamphetamines for six months but used cannabis daily. He stated his housing situation did not allow him to care for E.H., as he lived in a single residence occupancy (SRO) unit.

The Agency found E.H. was in good medical and physical health. E.H.'s doctor at Kaiser Permanente reported E.H. had been diagnosed with autism and had "difficulty expressing himself through language." The doctor recommended further applied behavior analysis (ABA) therapy. E.H. had an individualized education plan (IEP) due to his autism and speech impairment, and his disability affected his ability to participate in classroom activities, appropriately communicate and socially interact with others, and follow adult directions without specialized services and supports. He had been placed with a foster parent who had experience working with minors on the spectrum. The foster parent reported some challenges with E.H. hitting himself and others and screaming when he became overwhelmed, but the

4

foster parent had worked to reduce these outbreaks through positive reinforcement and a stable routine.

The Agency reported that E.H. "is connected to his maternal family and has a limited relationship with his father."  Father "has not had significant contact with the minor throughout his life" and was "an absent father, with little interactions and/or contact with the child."

Regarding visitation, the Agency reported that Mother was disengaged and abruptly ended the first in-person visit with E.H., but she attended all subsequent visits.  Father missed one visit during the review period due to illness.  The parents reportedly "interacted very well" with E.H.

In a December 2023 addendum report, the Agency reported that E.H. had been moved from his initial foster placement and was being assessed for further placement and services because the caregiver did not have "the skills to be able to address and mitigate [E.H.'s] developmental and behavioral needs."

The Agency further reported that Mother initially tested negative for substances, but her drug tests from September 2023 came back positive for methamphetamines, amphetamines, and marijuana, and a third test came back positive for the same substances, along with fentanyl.  Father meanwhile had not identified the services he was purportedly engaging in to address his substance abuse and mental health issues.  He displayed erratic behavior with the social worker, sending her repeated messages and blaming her for his own trauma and child welfare history.

At the jurisdiction hearing in December 2023, the juvenile court sustained a first amended petition, continued the matter for disposition, and maintained supervised visitation for the parents.

In a second addendum report filed in March 2024, the Agency reported that Mother tested positive for marijuana in December 2023, and her January 2024 results came back positive for norfentanyl, the metabolite of fentanyl. Mother claimed the test results were inaccurate and stressed she had been participating in substance abuse treatment. She missed some drug tests due to purported illness. Mother's psychiatrist reported her working diagnosis was unspecified schizophrenia with moderate methamphetamine use. Mother had reportedly stopped taking psychotropic medication against medical advice while pregnant with D.B., and she refused to provide the social worker with any details about her psychotropic medication.

The Agency reported E.H. had been moved to an intensive services foster home in Brentwood. He was being transported to his school of origin in San Francisco, a two-hour commute each way, and the school reported that his behavior had become "more intense." He was reportedly hitting and punching himself and others for no apparent reason. He was continuing to receive ABA therapy.

At the contested disposition hearing on March 21, 2024, the juvenile court adopted the recommendations of the Agency and ordered out-of-home placement for E.H., with reunification services for the parents. Mother was granted unsupervised visitation, while Father was granted an additional in-person supervised visit per week.

### D. Post-Disposition Review Period

In September 2024, the Agency filed a status review report recommending the parents' reunification services be terminated. According to the Agency, Father still lived in an SRO and was unwilling to accept services and interventions. He had met with a therapist, but the Agency believed he needed more intensive support. At times, he presented with

6

rapid speech, and his thoughts were not linear, but he denied a substance abuse problem. The Agency emphasized that in all three of the dependency cases involving this family, Father failed to take accountability for his actions and denied needing services.

Father's twice-weekly visits with E.H. reportedly went well. His visits progressed from supervised to monitored in the community. Father was described as a caring parent who brought food and toys to the visits. He was coherent and attentive and did not appear to be under the influence of substances during visits.

Mother was engaged in individual and group therapy, domestic violence services, and substance abuse treatment and testing. During the reporting period, the Agency increased Mother's visitation and facilitated unsupervised visits, as well as an in-home trial visit for E.H. Mother was described as "capable and attentive" and kept her home clean, with food, toys, and other provisions for the children. She interacted with the children lovingly and attended to each of their needs, while the children appeared comfortable, responsive to her directives, and happy in her presence.

From July to August 2024, Mother missed several drug tests for various reasons. In mid-August 2024, Mother tested positive for fentanyl. Due to her relapse, the Agency changed visitation to twice-weekly monitored visits, and Mother "expressed serious apprehension about the Agency's requirement that she be sober when parenting her children." The Agency concluded that "[d]espite [Mother's] stellar engagement, connection to resources, intelligence, and parenting skills, she has not been able to demonstrate a desire or ability to remain sober in order to safely parent her children."

E.H., age eight at the time of the report, had been placed in eight different foster homes since his removal and was most recently placed with his great aunt. He was in a special day class, received services through the school district for his autism, and was engaged in ABA therapy. The Agency described E.H.'s "inability to effectively use language to communicate feelings, needs, and experiences," but noted he could engage in basic conversation when he felt comfortable. When E.H. experienced unexpected changes or transitions, he would cry, elope, refuse to go to school, hit, and pull hair. The Agency emphasized the "overwhelming need" for E.H. to be "able to acclimate to a home, school, and community without facing the fear of being uprooted. Multiple removals and arbitrary placement changes have traumatized him and caused major setbacks in his overall progress and functioning."

The six-month review hearing was continued after Father filed a request to elevate his parenting status to presumed parent, a move that was opposed by minor's counsel. In November 2024, the juvenile court held what it concluded was the 18-month review hearing and found that E.H. could not safely be returned to the parents. The court terminated their reunification services and scheduled a section 366.26 hearing. The court denied without prejudice Father's motion to be declared a presumed parent. The parents' visits were reduced to one visit per month.

**E. Section 366.26 Report**

In its section 366.26 report, issued in February 2025, the Agency recommended termination of parental rights and adoption as the permanent plan for E.H. The Agency reported E.H. had been placed with a great aunt for one month before being placed with Shauna Sims, an experienced caretaker who had earlier fostered E.H. for several months. E.H. reportedly

8

responded very well to Sims, who loved him, kept his environment calm, and was committed to adopting him. E.H. continued to receive services provided by the school district, including speech and behavioral therapy.

After reunification services were terminated, the parents' visitation was reduced to one Saturday visit at the library or a park. E.H. was happy to go to visits with Mother but did not return her affection when she greeted him, and he separated easily at the end of visits. The Agency similarly reported that E.H. appeared comfortable around Father but did not return his hugs.

### F. Mother's Section 388 Petition

In May 2025, Mother filed a section 388 petition seeking reinstatement of reunification services. Mother alleged that since the 18-month review hearing in November 2024, she had continued engaging in services to support her mental health and sobriety and began participating in new services, including a methadone program and a modified therapeutic substance abuse program. Mother had also moved out of her prior residence in the Tenderloin, where she faced daily challenges, and was now living in a more positive environment. In her petition, Mother stated that an additional six-month period of reunification services would "support and strengthen [Mother's] sobriety" and would "demonstrate to the court, the benefit to [E.H.]" that Mother "is ready and able to receive the child back into the home, to resume the parental role and to build upon the already loving relationship she and [E.H.] have."

In support of her petition, Mother included several letters: one from her therapist indicating that Mother had continued to actively participate in weekly psychotherapy sessions since December 2023; a second letter from a counselor at an opioid addition treatment clinic confirming Mother's

9

participation and compliance with her treatment plan since February 2025; a third from the addiction recovery services at Kaiser, confirming Mother's current enrollment and active participation in services since September 2024; and a fourth letter from therapist Edna Barnes, with whom Mother had been engaging since December 2024. Barnes stated Mother had been cooperative and reflecting in sessions and was making meaningful progress.

The juvenile court scheduled a hearing to address whether or not to grant an evidentiary hearing on Mother's section 388 petition. At the hearing on May 12, 2025, the court ultimately declined to hold an evidentiary hearing, concluding Mother had not made a prima facie showing of changed circumstances given her prior engagement in services that did not resolve her underlying substance abuse. The court further concluded it was not in E.H.'s best interest to vacate the section 366.26 hearing and offer Mother additional services, as E.H. was presently with a caregiver who was meeting his needs.

**G. Section 366.26 Hearing**

The contested section 366.26 hearing took place on May 14, 2025. Protective services worker ("PSW") Monica Ternullo was called as a witness for Mother. Ternullo testified that during her work on the case, Mother's supervised visitation had progressed, and visits were consistent and positive. Mother showed patience with E.H., and her interventions sometimes helped to calm him. Although E.H. had limited language skills and significant behavioral issues that made it difficult to assess the quality of his relationship with Mother, Ternullo noted E.H. would generally respond to Mother's directions and attempts to interact. Mother was a good education advocate for E.H.

On cross-examination, Ternullo acknowledged that despite her positive remarks about Mother, she still recommended termination of services based

10

on Mother's relapse and Ternullo's observations that E.H. was comfortable, happy, and more expressive and willing to interact in his placement with Sims.

With regard to Father, Ternullo testified that as visits transitioned from supervised to community-based visits, Father was appropriate with E.H., and the visits were positive.

PSW Sharon Anderson testified regarding her involvement in the case after reunification services were terminated. With regard to Sims's report that E.H. was "pretty normal" and once in a while was "more agitated" after visits with Mother, Anderson believed, based on her review of contact logs, the case file, and the prior social worker's notes, that E.H.'s agitation occurred because of the car ride or change in routine. On one occasion, Anderson was at Sims's home and observed "he was eager to go when the transportation worker came" to take him for a visit with Mother. However, Anderson testified that E.H. never had "an issue" in separating from Mother at the conclusion of visits, and that he kept his arms at his sides when Mother hugged him.

Anderson further testified that Father's visitation had been mostly consistent. In Anderson's view, nothing stood out about the visits, and E.H. had no negative reaction when the visits were reduced from once a week to once a month. When asked how she assessed this, Anderson responded, "mostly, through the reports of the caregiver." Anderson explained she did not interview E.H. "because he doesn't talk. The only time he has talked to me is when he is prompted by his caregiver to say, thank you, hello, or goodbye. Then he kind of just echoes it back." Anderson acknowledged she did not ask E.H. whether he missed either parent.

11

When asked whether Father's role was beneficial to E.H., Anderson explained that the permanency provided by Sims was more beneficial given Father's pattern of substance abuse. She later testified that post-adoption contact with Father could be a benefit to E.H., but she acknowledged there was no agreement on post-adoption contact. Anderson testified that due to E.H.'s special needs, she did not know how the severance of the parent-child relationship with either parent would affect the child.

Anderson explained E.H. would communicate by making a face, walking backwards, or twiddling his fingers. Although he would not sit close to her, Anderson noted E.H. would sit close to Sims, listen to her, and do whatever she asked him to do. He had had no behavioral outbursts since living with Sims, and there had been no reported difficulty at school. Anderson believed that E.H. looked to Sims as a parent to take care of his daily needs, and that adoption was the best permanent plan for E.H.

Mother's evidence included a flash drive containing videos of her and E.H. dancing and a graduation ceremony during which E.H. could be heard asking for Mother. The drive also contained a collage of photographs of E.H. and Mother; a compilation of visitation and transportation logs from September 2023 to March 2025; a copy of the Agency's six-month status review report; and a letter from E.H.'s special education teacher. A letter from Mother was admitted over the objections of the Agency and minor's counsel.

Mother also testified. She believed E.H. was attached to her and excited to see her based on how he smiled and walked with her. Mother described two instances when it was hard for E.H. to leave at the end of visits. She further explained that E.H. enjoyed looking through photographs and videos of them and verbally instructed her to "make it record. Then I

have to record whatever he is doing. Then I have to watch it because I record him so much."

Father presented no evidence on his own behalf.

After closing arguments, the juvenile court took the matter under submission and continued the case for decision on May 19, 2025. At the continued hearing, the court first found by clear and convincing evidence that E.H. was generally and specifically adoptable, and that both parents had satisfied the first element of the beneficial relationship exception by maintaining consistent visitation.

Turning to the second element as it pertained to Father, the juvenile court found he had offered no evidence that E.H. was "bonded to him for a significant period of time or that he provided any day-to-day care for the child." The court noted visits were "generally positive, but there was no persuasive evidence of a significant positive attachment from [E.H.] toward [Father]." Relying on Anderson's testimony, the court noted that E.H. was "unaffected by the visits and acted 'normal,' after the visits, and there was no on problem separating at the end of the visits."

The juvenile court further found Father did not satisfy the third element of the beneficial relationship exception that terminating parental rights would be detrimental to E.H. In concluding E.H. would not be harmed by severing his relationship with Father, the court observed E.H. "has lived for a significant amount of time with Ms. Sims thriving" and is more talkative and more expressive with fewer behavioral issues while in her care. The court also pointed to "evidence that behavioral incidents at school are down" and to "evidence that Ms. Sims can calm [E.H.] down and that she loves him, and there is evidence that they are affectionate."

13

The juvenile court then turned to Mother's showing and found that, on balance, Mother satisfied the second element of the beneficial relationship exception by sufficiently demonstrating E.H. had a significant, positive, and emotional attachment to her. The court noted E.H. had lived about half of his life with her; he referred to her as "mommy" and was eager to go on visits with her; he reciprocated her affection; and she was a calming presence for him. However, the court concluded Mother failed to satisfy the third element of the beneficial relationship exception. The court cited evidence that Mother's missed visits with E.H. "had no impact" on the child. The court further noted that, unlike in *In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*), there was no evidence suggesting the termination of the relationship "would lead to emotional instability, acting out, difficulties in school, insomnia, depression," and there was no " 'intense bond.' " In highlighting "the opposite evidence that [E.H.'s] emotional instability and behavioral incidents have decreased while he has been with Ms. Sims," the court determined the bond with Mother was "not an intense one" and found "no evidence of distress on [E.H.'s] part at . . . not being able to live with [Mother]."

Based on its findings, the juvenile court terminated the parental rights of both parents. The court also found that ICWA did not apply.

Father and Mother each appealed.

## DISCUSSION

### A. Section 388 Petition

Mother contends the juvenile court erred in summarily denying her section 388 petition because she made a prima facie case of changed circumstances based on her engagement in new services and her change of

14

residence to a more stable environment. No error or abuse of discretion appears.

"Section 388 permits the parent of a dependent child to petition the juvenile court for a hearing to modify an earlier order on the basis of changed circumstances or new evidence. [Citation.] The petitioning party bears the burden of showing that there is new evidence or changed circumstances and that the proposed modification would be in the best interests of the child." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120 (*N.F.*).) "Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion." (*In re J.C.* (2014) 226 Cal.App.4th 503, 525.)

The petitioning party must make a prima facie showing of the requisite elements to warrant an evidentiary hearing on a section 388 petition. (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.) A prima facie showing is made when "the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*Ibid.*) " '[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interest of the child, the court need not order a hearing on the petition.' " (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.)

"Not every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citations.] In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated. [Citations.] The change in circumstances or new evidence must be of such significant

15

nature that it requires a setting aside or modification of the challenged order." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

"In the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*N.F.*, *supra*, 68 Cal.App.5th at p. 121, citing *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [7 months of sobriety since last relapse insufficient to show changed circumstances]; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["one must be 'clean' for a much longer period than 120 days to show real reform"].) Courts have held that when a parent has a long history of substance abuse, a period of recent and relatively brief sobriety represents "changing" rather than "changed" circumstances. (See *In re Alayah J.* (2017) 9 Cal.App.5th 469, 482.)

The juvenile court did not abuse its discretion in concluding Mother failed to make a prima facie showing of changed circumstances to entitle her to an evidentiary hearing on her section 388 petition for modification. The record reflects that Mother has grappled with substance abuse for more than half her life, and that her methamphetamine abuse led to two prior dependency proceedings in 2018 and 2020 as well as the instant proceedings. During this case, the Agency continued to report Mother's positive drug tests through mid-August 2024. And in September 2024, she expressed "serious apprehension about the Agency's requirement that she be sober when parenting," which reflected a troubling lack of insight into her substance abuse and the threat that it posed to her young children.

As such, Mother had to show more than "a relatively brief period of sobriety or participation in yet another program" to demonstrate changed circumstances. (*N.F.*, *supra*, 68 Cal.App.5th at p. 121.) The allegations and

16

evidence supporting Mother's petition demonstrated that she had been continuing to engage in existing services for mental health and sobriety since November 2024; that she was in the process of receiving opioid addiction treatment; that she had remained compliant with counseling and medication since February 2025; and that she had moved out of a challenging neighborhood. We commend Mother for these efforts. Nonetheless, the record reflects that Mother's problems with substance abuse have been resistant to similar services in the past, and that her recent period of sobriety—approximately 9 months between Mother's last positive drug test and the juvenile court's decision on her section 388 motion—was comparatively brief given her long history of substance abuse. On this record, we cannot say the court abused its discretion in concluding Mother's petition demonstrated changing but not yet changed circumstances.[2]

## B. Beneficial Relationship Exception to Termination of Parental Rights

The parents contend the juvenile court erred in concluding the beneficial relationship exception did not apply in this case. As we shall explain, we conclude substantial evidence supported the court's factual findings against the parents, and its determination that any harm of terminating their parental rights would not outweigh the benefits of adoption was not an abuse of discretion.

### 1. General Legal Principles

At a section 366.26 hearing, the juvenile court may order one of three alternative permanent plans: adoption, guardianship, or long-term foster

---

[2] In light of our conclusion, we need not address the Agency's alternative contention that the juvenile court could have denied Mother's section 388 solely on the grounds that it was filed too close in time to the section 366.26 hearing.

17

care.  (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)  If the juvenile court finds by clear and convincing evidence that the child is likely to be adopted, the court shall terminate parental rights to allow for adoption, subject to several statutory exceptions.  (§ 366.26, subd. (c)(1).)  It is the parent's burden to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).  (*In re S.B.* (2008) 164 Cal.App.4th 289, 296–297.)

At issue here is the beneficial relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  To establish this exception, a parent must establish, by a preponderance of the evidence, three elements: (1) regular visitation and contact; (2) a relationship, the continuation of which would benefit the child; and (3) the termination of parental rights would be detrimental to the child.  (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The first two elements are factual determinations reviewed for substantial evidence, while the third element involves both factual determinations reviewed for substantial evidence, as well as the juvenile court's weighing of the harm of losing the relationship against the benefits of placement in a new, adoptive home, which is reviewed for abuse of discretion.  (*Id.* at pp. 639–641.)

In evaluating whether the beneficial relationship exception applies, we do not consider the possibility that visits will continue after adoption. Rather, we "must assume that terminating parental rights terminates the relationship.  [Citations.]  What courts need to determine, therefore, is how

18

the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

### 2. *Undisputed Findings*

There is no dispute that E.H. was shown to be adoptable by clear and convincing evidence, or that the parents adequately maintained regular visits and contact with E.H. to meet the first element of the beneficial relationship exception. Thus, we turn to the second and third *Caden C.* elements.

### 3. *Existence of Beneficial Relationship*

For the second element of the beneficial relationship exception, the juvenile court must determine whether there is a "significant, positive, emotional" parent-child relationship that the child would benefit from continuing. (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.) "[T]he focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.] Certainly, it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Id.* at p. 632.)

We conclude substantial evidence supports the juvenile court's ruling that Father did not satisfy the second *Caden C.* element. E.H. was eight years old at the time of the section 366.26 hearing and had special needs due

to his diagnosis of autism, needs that had proven challenging even for multiple skilled foster caretakers during the dependency proceedings. He had never lived with Father and the two had only minimal contact prior to the initiation of the dependency proceedings. During the prior two dependency matters, Father never gained placement or physical custody of E.H., and his therapeutic visitation with the minor was eventually terminated. In the instant proceedings, visits never progressed beyond supervised and monitored status. In short, the evidence of Father's very limited contact and caregiving experience with E.H. over the course of the child's life supports the court's conclusion that the two did not form a significant and emotional attachment that E.H. would benefit from continuing.

Father emphasizes that his interactions with E.H. during visits were appropriate and positive, and that E.H. was comfortable and happy in Father's presence. But "[a] parent must show more than frequent and loving contact or pleasant visits" in order to carry their burden as to the second *Caden C.* element. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Notably, it was reported E.H. did not return Father's outward displays of affection or experience any difficulty separating from Father when visits ended and when Father's visitation was reduced. On this record, the court could reasonably conclude the evidence of positive interactions during visits was insufficient to demonstrate the type of significant emotional attachment necessary to meet the beneficial relationship exception. (See *In re Andrew M.* (2024) 102 Cal.App.5th 803, 819 (*Andrew M.*) [no evidence that minor showed distress or was upset when separating from parents]; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1311–1313, 1316 [minor never lived with mother and evidently had no difficulty separating from her].)

20

Father suggests the juvenile court erred by relying on PSW Anderson's testimony because she admitted during the section 366.26 hearing that she had not considered any beneficial aspects of E.H.'s relationship with Father. Though Anderson testified she simply "did not consider" whether there was a benefit to E.H. in maintaining his relationship with Father, such testimony provides no grounds for reversal. It was ultimately Father's burden to prove the existence of a beneficial parent-child relationship (*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637), not the Agency's burden to show the absence of it. Critically, Father simply chose to cross-examine Anderson, while offering no testimony or evidence at the section 366.26 hearing on the nature and quality of his relationship with E.H. Unlike Mother, Father did not submit any detailed logs of his visits with E.H. (see *In re J.D.* (2021) 70 Cal.App.5th 833, 856 (*J.D.*) [visitation logs provided "an extremely telling glimpse of how" child felt and interacted with parent]), nor does he contend such records were unavailable to him.

Meanwhile, Anderson's testimony was not the only evidence before the juvenile court that bore on Father's relationship with E.H. As Father points out, the Agency had a duty to provide "objective, disinterested information" about the quality of parent-child contacts to assist the juvenile court in evaluating the beneficial relationship exception. (*J.D.*, *supra*, 70 Cal.App.5th at p. 860; see §§ 366.22, subd. (c)(1)(B), 366.21, subd. (i)(1)(B); *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343–1345.) Our review reveals that at all relevant times, the Agency included facts about the quality of Father's interactions with E.H. in its reports to the juvenile court. These reports provided substantial evidence for the juvenile court's findings regarding the relationship between Father and E.H.

Father additionally criticizes Anderson for "rel[ying] on the caretaker, the person who had a vested interest in parental rights being terminated, to tell her whether the child was effected [sic] by any reduction in visits" and for not asking E.H. how he felt about Father or whether he missed Father. But Father cites no authority that prohibits a social worker or juvenile court from relying on information from a prospective adoptive parent in assessing the parent-child bond, particularly where the child lacks the ability to effectively communicate. (See *In re Keyonie R.* (1996) 42 Cal.App.4th 1569, 1572 [hearsay in social worker's report is admissible to support juvenile court's findings at post-disposition review hearing].) As Anderson explained, she did not interview E.H. because he is mostly nonverbal, and the record amply establishes that E.H. had difficulty expressing himself through language. On this record, the court could reasonably conclude it was appropriate for Anderson to rely on Sims's accounts of E.H.'s behavior before and after visitation to assess the impact of the visits with Father.

Father's remaining arguments likewise fail to persuade us that the juvenile court erred. He suggests his limited contact with E.H. should not be held against him because, as he testified at the 18-month review hearing, Mother would "run[] and hide[] . . . behind the restraining order" and "ignore[]" him when he attempted to contact her.[3] He further contends E.H.

---

[3] The Agency contends Father cannot cite, and we may not consider, Father's testimony from the 18-month review hearing because he did not present this same evidence to the juvenile court at the section 366.26 hearing. Though the Agency cites no specific authority prohibiting a reviewing court from considering a parent's testimony from a prior hearing in the same dependency case, we acknowledge that general principles of forfeiture and fairness may dictate such a result. (See *In re D.P.* (2023) 92 Cal.App.5th 1282, 1292–1293.) In any event, Father's earlier testimony would not have assisted him in demonstrating the juvenile court's error on the second *Caden C.* element. Notably, the record indicates that the

22

did not show affection in typical ways due to his autism, and thus, the comfort and happiness he displayed during visits supported the conclusion that the relationship was beneficial to him.  However, on review for substantial evidence, we must "draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion."  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)  Father's attempt to draw inferences and view the record in a light most favorable to him is insufficient to demonstrate error.

In sum, the juvenile court did not err in concluding Father failed to demonstrate the existence of a beneficial parent-child relationship.

### 4. *Whether Harm of Terminating Parental Relationship Outweighs Benefits of Adoption*

For the third element of the beneficial relationship exception, the juvenile court must determine "whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.'  [Citation.]  'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights.  [Citation.]  That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]'  [Citation.]  When the relationship with a parent is so important to the child that the security and stability of a

---

restraining order, which was issued in or around May 2021 during the second dependency case, "allowed for supervised visits."

new home wouldn't outweigh its loss, termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634, italics omitted.)

As our Supreme Court has cautioned, "understanding the harm associated with severing the relationship is a subtle enterprise—sometimes depending on more than just how beneficial the relationship is. In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home. [Citation.] A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Examples of potential harms from the loss of a parental relationship may include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Id.* at p. 633.)

We conclude the juvenile court did not abuse its discretion in concluding the parents did not satisfy the third *Caden C.* prong. The court's on-record remarks reflected the appropriate and subtle balancing of the relevant considerations required under *Caden C.* As the court noted, E.H. has thrived in his placement with Sims, who wishes to adopt him and has provided a stable home environment appropriate to his special needs. His relationship with Father was not shown to be sufficiently significant to suggest E.H. would be harmed by losing it, and despite E.H.'s attachment to Mother, he generally showed no difficulty separating from her after visits.

24

On this record, the court could reasonably conclude that life for E.H. in the adoptive home without the parents in his life would not be so detrimental that it outweighed the benefits of a secure and stable new home.

Resisting this conclusion, the parents emphasize the positive interactions they had with E.H. during visits. But this was insufficient to satisfy their burden. "A ' "showing [that] the child would derive some benefit from continuing a relationship maintained during periods of visitation" ' is not a sufficient ground to depart from the statutory preference for adoption. [Citation.] It is only '[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, [that] termination would be "detrimental to the child due to" the child's beneficial relationship with a parent.' " (*Andrew M.*, *supra*, 102 Cal.App.5th at p. 818.) The parents "must prove some type of harm beyond the fact that their loving visits would cease." (*Id.* at p. 820.)

Father insists there was a "plethora" of evidence of such harm. For instance, he argues the testimony of child welfare worker Amone Bounkhoun at the disposition hearing provided evidence of "visible behavioral issues after visits ended," such as E.H. not wanting to eat, not wanting to get up the next morning, and being less responsive to the caregiver's directions. Setting aside Father's forfeiture of this contention by failing to present Bounkhoun's testimony at the section 366.26 hearing, we conclude the evidence does not compel a finding in Father's favor as a matter of law. (See *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1165 (*Aurora P.*) [where issue on appeal turns on appellant's failure of proof at trial, question is whether evidence compels a finding in appellant's favor as a matter of law].) Notably, Bounkhoun did not attribute E.H.'s behavioral issues to his dissatisfaction with the foster caregiver or the termination of visits with the parents. Indeed, when asked if

25

E.H.'s behavior was a sign that he wanted more time with the parents, Bounkhoun responded, "it's hard to say with [E.H.] given his developmental disability and that he's not able to articulate it. I don't know how much of it is, you know, his parents, how much of it could be just a long car ride." As such, Bounkhoun's equivocal testimony does not compel a finding in Father's favor as a matter of law.

Father also relies on testimony that he and Mother gave at the 18-month review hearing. Specifically, Father cites his testimony that E.H. showed "a little disappointment" when visits ended and once asked Father if he would "run away with him." Father also cites Mother's testimony that E.H. would "hit sometimes because he doesn't want to leave me," and would "throw a fit when it is time to leave." Again, setting aside Father's failure to present this evidence at the section 366.26 hearing, we are not persuaded the cited testimony calls for a finding in Father's favor as a matter of law. (*Aurora P.*, *supra*, 241 Cal.App.4th at p. 1165.) Because Mother already gave similar testimony at the section 366.26 hearing, i.e., that E.H. hit her because "he didn't want me to leave," we may reasonably assume the juvenile court would have remained unpersuaded by the additional cumulative testimony. Moreover, the juvenile court was not required to accept the parents' self-serving testimony, and the court was entitled to credit other evidence in the record that showed E.H. generally having no difficulty separating from the parents.

Father suggests he sufficiently demonstrated that E.H. would be harmed by the termination of parental rights by testifying at the disposition hearing regarding his firsthand knowledge of the difficulties and disadvantages of growing up in foster care and having no ties to family. Once again, setting aside Father's failure to present this testimony at the section

26

366.26 hearing, we are unconvinced that Father's testimony on *his* personal experiences in the foster care system bore on the "case-specific inquiry" (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634) required of the juvenile court as to E.H. based on his circumstances and needs.

Father additionally contends the juvenile court erroneously considered an "irrelevant and erroneous factor" in evaluating the third *Caden C.* element:  whether Father "provided day to day care for his child."  We disagree.  From our review of the record, it is readily apparent the juvenile court remarked on Father's lack of day-to-day care of E.H. in connection with the second *Caden C.* element, not the third.  As discussed above, in determining whether there is a beneficial parent-child relationship at the second *Caden C.* step, it is appropriate to consider the portion of the child's life spent in the parent's custody and care.  (See *Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.)

Mother, meanwhile, contends she sufficiently demonstrated that E.H. would be harmed by the termination of her parental rights, citing her testimony that she had particular insight into E.H.'s specific needs, was a strong educational advocate for him, and was able to sooth him and maintain a clean and safe home for him.  Though we acknowledge and laud Mother's efforts in these matters, we cannot say the juvenile court abused its discretion in concluding that any harm to E.H. from the loss of this relationship did not outweigh the benefits of adoption.  Viewing the record favorably to the judgment, the court could reasonably conclude E.H. will be provided with comparable comfort, support, and safety in his prospective adoptive home, with the added benefit of permanency.  (See *Andrew M.*, *supra*, 102 Cal.App.5th at p. 816 [record revealed "no particular need that can be met uniquely by the parents"].)

27

Citing *Caden C.*, Mother contends it "should not be held against" her that E.H. is doing well in Sims's care. But nothing in the record suggests the juvenile court improperly compared Mother's "attributes as custodial caregiver relative to those of any potential adoptive parent(s)," as disapproved in *Caden C.* (*Caden C., supra*, 11 Cal.5th at p. 634.) Put another way, the court did not improperly evaluate whether Mother could provide as secure and stable a home as E.H.'s prospective adoptive home. Rather, the record reflects the court appropriately balanced the benefits E.H. stood to receive from his adoptive home against any potential harm he may experience from losing his relationship with Mother and concluded the balance weighed in favor of adoption. That was an appropriate balancing of the relevant factors on the third *Caden C.* element.

For all of the foregoing reasons, we conclude the parents fail to demonstrate that the juvenile court abused its discretion or otherwise erred in finding the beneficial relationship exception inapplicable.

**C. ICWA Compliance**

Father (joined by Mother) contends the juvenile court's finding of ICWA inapplicability was not supported by substantial evidence. The Agency concedes the record is insufficient to establish that it conducted a satisfactory inquiry into Father's potential Native American ancestry. We accept the Agency's concession and agree that a conditional reversal and remand is required.

### 1. Additional Background

In its initial section 300 petition, the Agency attached a Judicial Council form ICWA-010(A) stating that the parents had been interviewed in June 2023, and that "[t]his inquiry . . . gave [the social worker] reason to believe the child is or may be an Indian child.

28

In its combined detention and jurisdiction report, the Agency stated that Father had previously reported having "Blackfoot" ancestry.[4]

In its disposition report, the Agency indicated that "[f]urther inquiry is required because there is **reason to believe** the child[] is an Indian child." (Original emphasis.) The Agency reiterated this point in an addendum report filed in December 2023. In a second addendum report in March 2024, the Agency stated that ICWA "does or may apply," while reporting that a "maternal great grandfather (on the mother's mother side) denied any Native American ancestry on his side of the family. Additionally, the social worker reportedly left a voice message with "the maternal grandfather (mother's father)" and was awaiting a return call. The Agency stated additional time was needed to determine if there was a reason to believe or know that E.H. was an Indian child.

In March 2024, Father filed a Judicial Council form ICWA-020 indicating he is or may be eligible for membership in a federally recognized tribe, but he left blank the spaces for identifying the name and location of the tribe.

In September 2024, the Agency filed a status review report recommending the juvenile court find that ICWA did not apply. The Agency asserted that "[u]pon lengthy inquiry and lack of response, the Agency has determined that [E.H.] and [D.B.] are not ICWA eligible."

In its section 366.26 report, the Agency stated that "[o]n 8/20/2020, the Court found that the [ICWA] does not apply for [E.H.]"

---

[4] The Agency asserts that there is no "Blackfoot" tribe as Father reported, and that the closest federally-recognized tribe is the Blackfeet Tribe of Montana.

29

At the section 366.26 hearing, the juvenile court summarily found that ICWA did not apply.

### 2. Analysis

ICWA and California's related statute (Cal-ICWA; § 224 et seq.) "are intended to protect Native American heritage, cultural connections between tribes and children of Native American ancestry, the best interests of Indian children, and the stability and security of Indian tribes and families." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125 (*Dezi C.*).) Under these laws, "courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases." (*Dezi C.*, at p. 1125.)

"ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).) As relevant here, "section 224.2 creates three distinct duties regarding ICWA in dependency proceedings." (*D.S.*, at p. 1052.) After a child welfare agency's initial contact with the minor and his or her family, "the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that ["initial"][5] inquiry creates a 'reason to believe' the child is an Indian child, then the [Agency] 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics omitted.) Third, if that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3

---

[5] As our Supreme Court has emphasized, the term "initial" inquiry "is a bit of a misnomer, as the duty 'continues throughout the dependency proceedings.'" (*Dezi C.*, *supra,* 16 Cal.5th at p. 1132.)

apply." (*D.S.*, at p. 1052, italics omitted.) "On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*D.S.*, at p. 1051.)

The initial inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b)(2).) " '[E]xtended family member' means 'a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.' " (*Dezi C.*, *supra*, 16 Cal.5th at p. 1132, citing 25 U.S.C. § 1903(2), § 224.1, subd. (c).) "[S]ection 224.2 'does not require the agency to "find" unknown relatives and others who have an interest in the child, merely to make reasonable inquiries. The operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked.' " (*Dezi C.*, at p. 1140.)

"If the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e).) "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the

31

parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).)

With these authorities in mind, we turn to the facts of this case. Father's express claim to Native American ancestry was "information suggesting" that he and/or E.H. "may be eligible for membership or citizenship, in an Indian tribe," which established a "reason to believe" E.H. was an Indian child. (§ 224.2, subd. (e)(1).) The Agency's receipt of this information triggered a "further inquiry" (§ 224.2, subd. (e)), including interviewing the parents, Indian custodian, and any reasonably available extended family members, and contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance (*id.*, subd. (e)(2)).

We cannot say the record before us establishes an adequate further inquiry, let alone an adequate initial one. As far as we can ascertain, the Agency interviewed the parents and made or attempted contact with two family members on Mother's side. We are not aware of any attempts to contact reasonably available extended family members on Father's side even though it was he who claimed Native American ancestry. That Father's reference to a "Blackfoot" tribe did not precisely match the name of any federally-recognized tribe did not put the matter to rest, and the Agency does not contend otherwise.

We note there was evidence in this case of a prior ICWA inapplicability finding dated "8/20/2020," which would have been during the early stages of the second dependency case. While we are not aware of any authority prohibiting a juvenile court from carrying forward an ICWA inapplicability finding from a prior dependency case involving the same family members, we cannot say that prior finding is dispositive in this case. The record before us does not include any of the information supporting the August 2020 finding.

32

Furthermore, even where a court makes a finding that ICWA does not apply, the child welfare agency and the court "have a continuing duty under ICWA, and the court 'shall reverse its determination if it subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry.'" (*Dezi C.*, *supra*, 5 Cal.5th at p. 1134.) Given the Agency's concession that a conditional reversal and remand is appropriate, and mindful of the continuing obligations of the Agency and the juvenile court under ICWA and Cal-ICWA, we conclude it is appropriate to conditionally reverse the order terminating parental rights with directions for the Agency and the court to ensure compliance with ICWA and Cal-ICWA.

## DISPOSITION

The juvenile court's May 19, 2025, order terminating parental rights is conditionally reversed, and the matter is remanded for further proceedings. We direct the Agency and juvenile court to comply with the inquiry and notice provisions of ICWA and Cal-ICWA consistent with this opinion. Based on the information reported, if the court determines that no additional inquiry or notice to tribes is necessary, the order terminating parental rights shall be reinstated. If additional inquiry or notice is warranted, the court shall make all necessary orders to ensure compliance with ICWA and related California law.

33

_____

Fujisaki, J.

WE CONCUR:

_____

Tucher, P.J.

_____

Streeter, J.

*SFHSA v. J. J.* (A173260)

34